# UNITED STATES DISTRICT COURT

### for the

### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4072 Southview Dr., Greensboro, North Carolina 27407 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:24MJ286-1

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Middle_____ District of _____North Carolina_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 933 | Trafficking in Firearms |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Jacob Hudson
_____
*Applicant's signature*

Special Agent Jacob Hudson, ATF
_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____08/01/2024___3:00 pm_____

City and state: __Durham, North Carolina__

_____
*Judge's signature*

Joe L. Webster, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 4072 Southview Dr., Greensboro, North Carolina 27407 | Case No. 1:24MJ286-1 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jacob Hudson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for the premises of 4072 Southview Dr., Greensboro, NC 27407.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since April of 2023.  I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program, as well as the ATF National Academy, where I received extensive training in the investigation of firearms, controlled substances, arson, and explosives offenses.

3.      Prior to my career with ATF, I was employed as a police officer and deputy sheriff in the state of Florida for a combined fifteen (15) years. During my tenure as a law enforcement officer in the State of Florida I worked as a detective on a street crimes unit, multi-jurisdictional narcotics task force unit, homicide investigations unit, and violent fugitive apprehensions unit. I have been directly involved in complex investigations involving homicide, narcotics trafficking, and weapons offenses. I have authored numerous search/arrest warrants and been directly involved in the seizure of illegal firearms and illegal narcotics. I obtained a Bachelor of Science degree in Homeland Security from Columbia Southern University.

4. During my career in law enforcement, I have conducted and participated in numerous complex case investigations involving federal and state firearms and controlled substance violations. In furtherance of these investigations, I have utilized multiple investigative techniques including but not limited to physical and electronic surveillance, controlled purchases of evidence, management of confidential informants, forensic examination of electronic devices, and the seizure of electronically stored communications. I have experience monitoring and gathering information received from court ordered interception of wire and electronic communication, pen register and/or trap and trace device, real time GPS and geo-location information, historical call detail records, and vehicle GPS monitoring. I have participated in the execution of numerous search warrants authorizing the seizure of evidence in criminal investigations. Through this experience, I have been able to successfully gather criminal intelligence and utilize this information in furtherance of ongoing criminal investigations.

5. Based on my training, knowledge, and experience, I have become familiar with the following: (1) the manner in which firearms traffickers (a) transport, store, and distribute firearms, and (b) collect, keep, and conceal the proceeds of their illegal activities; and (2) the ways in which firearms traffickers use cellular telephones, electronic communications, internet service providers, social media, coded communications or slang during telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

6. Additionally, through my training and experience, my conversations with other agents, and my participation in firearms trafficking investigations, I am aware that:

   a) Firearms trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, firearms trafficking

is an illegal commercial business that is characterized by regular, repeated criminal activity.

b) Cellular telephones are an indispensable tool of the firearms trafficking trade. Firearms traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, internet service providers, social media, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators, associates, and customers.

c) Firearms traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, in electronic accounts, and on their phones or computers, and the records take various forms. Documents commonly concealed by traffickers include, but are not limited to, notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of firearms or other such documents which will contain identifying data on co-conspirators.

d) Firearms traffickers use cellular telephones, computers, electronic storage media, smart phones, physical and virtual servers through the Internet, cloud-based services, social media, and other electronic communications devices to facilitate illegal firearms transactions. The electronically stored information on these devices

and servers is of evidentiary value in identifying other members of the firearm trafficking organization and establishing the relationship between these individuals and other identifying information stored on these devices.

e) Firearms traffickers will sometimes transition to manufacturing and selling privately made firearms, also known as "ghost guns", which are untraceable by law enforcement, in an effort to avoid detection and thwart investigations.

7.     The facts set forth in this affidavit are based upon my personal knowledge of this investigation, conversations with law enforcement officers and other individuals who have personal knowledge of the events and circumstances described herein, review of reports, documents, and recordings created by others, as well as information that I gained through training and experience.

8.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 933 [Trafficking in Firearms] have been committed by Anthony HURDLE. There is also probable cause to search the property described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

10.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), &

(c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11.     On December 12, 2023, Bradley Boyd sold a firearm to Cash America Pawn in Winston-Salem which had previously been reported stolen. SA Hudson conducted an interview with Boyd and determined that he originally purchased the firearm from a licensed federal firearms dealer (FFL), EMPIRE ARMS, on or about June 2023. At the time, Boyd was unaware the firearm was stolen. I determined the firearm was originally reported stolen by EMPIRE ARMS. Boyd identified Anthony HURDLE as the owner/operator of EMPIRE ARMS and the subject who sold Boyd the firearm.

12.     Boyd did not believe any paperwork was completed related to the sale of the gun. Additionally, I conducted a trace of the stolen firearm which showed the final dealer of the firearm to be Lipsey's, a firearms distributor. I confirmed with Lipsey's that the firearm in question was shipped from them to EMPIRE ARMS but was reported stolen by EMPIRE ARMS who claimed the firearm was never received. There was no record of the firearm being sold by EMPIRE ARMS to Boyd which would be required under federal law.

13.     Additionally, Boyd alleged that HURDLE would conduct firearms transactions at local motorcycle events, selling the firearms from the bed of his pickup truck. Boyd alleged that HURDLE would conduct firearms transactions without completing the proper paperwork and did not believe National Instant Criminal Background Check System (NICS) checks were being

conducted on customers. Boyd also alleged that he heard from other members of the motorcycle group that HURDLE would be willing to illegally convert rifles to fully automatic.

14.     I identified EMPIRE ARMS LLC as an active federal firearms licensee (FFL) # 1-56-15055 with an origination date of 04/26/2021. I conducted a check of the ATF Federal Licensing System (FLS) and confirmed that HURDLE was the sole responsible person for the business. I confirmed the business address listed on HURDLE's federal firearms license to be 4072 Southview Dr Greensboro, NC 27407, the same as his residential address. I utilized numerous investigative resources to determine that EMPIRE ARMS has had approximately forty-two (42) crime gun traces from October of 2021 through April of 2024. Several of these recovered firearms have been associated with firearms trafficking investigations. The elapsed time between the original sale of the firearm from EMPIRE ARMS and the recovery by law enforcement was relatively short. The average time to crime of recover was approximately 180 days. This statistic is indicative of firearms trafficking and/or straw purchases.

15.     On or about January 1, 2024, I identified an historical tip that was received from an anonymous source on or about June 29, 2022, that alleged HURDLE was selling firearms to prohibited persons at local establishments around the Greensboro, NC area. It should be noted that it is also a violation of HURDLE's FFL to conduct firearms transactions away from his business premises, 4072 Southview Dr in Greensboro or any event that is not sanctioned by ATF for FFL transactions. This tip could not be substantiated at the time it was received.

16.     On or about January 10, 2024, I learned of an active narcotics investigation being led by Homeland Security Investigations (HSI) Agents in Greensboro, NC. The investigation was targeting a subject who was selling narcotics to Agents as well as offering for sale a firearm. Agents

were able to conduct a trace of this firearm from a photograph received from their target. The trace revealed that the firearm was originally purchased from EMPIRE ARMS.

17.      HSI Agents received phone toll data, pursuant to a subpoena and determined that their target had numerous instances of phone contact via text message and voice calls to EMPIRE ARMS. I confirmed the number listed in the HSI target's phone belonged to HURDLE through law enforcement databases as well as HURDLE openly posting his cell phone number on social media.

18.      On or about January 17, 2024, I identified an investigation which occurred in Greensboro, NC where a subject, Roy Valadez, was arrested for several state charges pursuant to a search warrant. Three (3) firearms were recovered and traced to EMPIRE ARMS. I conducted an interview with Valadez where he provided information that his cousin was using an unknown individual to straw purchase these firearms from a licensed firearms dealer, believed to be EMPIRE ARMS. Valadez stated his cousin (now deceased) was a convicted felon and unable to legally obtain firearms. Valadez stated his cousin would obtain identifications of other individuals who were legally allowed to purchase firearms and provide it to the firearms dealer to complete the paperwork. Valadez stated the firearms dealer was fully aware that the firearms were being straw purchased.

19.      Valadez stated the person his cousin used to obtain the guns from was a licensed firearms dealer in Greensboro. Additionally, Valadez stated that the firearms which were recovered in the residence when he was arrested were straw purchased using a female's identity. This female was not present when the transaction occurred at the firearms dealer and the female was not aware her identification was being used. Valadez further stated that he had participated in a video call with this firearms dealer and described him as a black male, heavier set, balding with

a beard or goatee. This physical description is consistent with HURDLE. Valadez stated the dealer operated the business from his residence, consistent with EMPIRE ARMS.

20.     Additionally, Valadez stated the primary method of communication with the FFL was through Facebook Messenger. Valadez stated the FFL has a Facebook page which displays the inventory that he has for sale.

21.     On or about February 26, 2024, ATF SA UC 5427 had been in communication with HURDLE via social media messenger, Facebook, and Instagram. These communications then transitioned to HURDLE'S cell phone, (336) 324-7792.

22.     On March 4, 2024, ATF Special Agents conducted an undercover (UC) controlled purchase operation from HURDLE at his residence and place of business, 4072 Southview Dr in Greensboro, NC. ATF UC SA 5427 attempted to purchase a handgun from HURDLE using an out of state driver license. HURDLE opened an enclosed trailer on the property where numerous firearms were being stored. HURDLE invited the UC SA inside the trailer to view the firearm inventory that was for sale. HURDLE made the comment that he uses the enclosed trailers to transport his firearms to and from gun shows and events. HURDLE advised the UC SA that he was unable to complete the transaction due to the UC SA not having the proper in state identification but suggested that the UC SA find someone else to complete the sale for him. Without being prompted, HURDLE suggested that the UC SA utilize his girlfriend who was a North Carolina resident to complete the sale and that HURDLE would hold the firearm for the UC Agent. Arrangements were made between UC SA 5427 and HURDLE to conduct this transaction at a future time.

23.     On or about March 5, 2024, HSI Agents provided I with extracted phone data from their target's cell phone, pursuant to a search warrant. I located several text messages between

HURDLE and the HSI target where HURDLE offered for sale two machine guns. It should be noted that HURDLE does not possess the proper license to possess or sell a machine gun. I located other text messages where the HSI target was communicating with other individuals to determine whose identification they would use to complete the sale of a firearm from HURDLE.

24.     I located text messages between the HSI target and HURDLE where the photograph of an identification card of a subject was being sent. Through the context of other text messages, it was determined this was the person whose name the firearm would be placed in. I utilized Etrace to confirm that this subject's name was documented on the trace of a recovered firearm, purchased from HURDLE.

25.     Since the undercover operation conducted on March 4, 2024, ATF UC Agent 5427 had remained in contact with HURDLE via phone and social media. The intention of UC SA 5427 was to return to complete the straw purchase of a firearm from HURDLE and this fact was made known to HURDLE. UC SA 5427 made it clear to HURDLE that he would be bringing his friend who had a North Carolina identification to complete the purchase for him.

26.     On March 18, 2024, ATF agents conducted an undercover operation where UC SA 5427 returned to meet HURDLE to purchase a firearm. On this occasion, UC SA 6287 accompanied him to act as the actual purchaser of the firearm even though UC SA 5427 was the intended recipient of the firearm. Both UC SA's met with HURDLE inside the garage of his residence. Inside the garage, displayed on numerous tables were roughly 50-100 firearms. UC SA 5427 browsed the selection of firearms while HURDLE directed UC SA 6287 on how to properly fill out ATF form 4473. UC SA 6287 verbally stated to HURDLE that it had been a long time since he had ever filled this form out and asked for direction. HURDLE clearly told UC SA 6287

which boxes to check and to ensure he checked "yes" that UC SA 6287 was the actual purchaser and intended recipient of the firearm.

27.     UC SA 5427 determined that he wished to purchase a Glock handgun, model 43X, SN CALP821, 9mm caliber. HURDLE prepared the firearm for sale at which time SA 5427 exchanged $600 with HURDLE for the purchase of the firearm. HURDLE provided the firearm directly to UC SA 5427 and never provided the gun to UC SA 6287 or questioned who the intended recipient of the firearm was.

28.     Once the UC operation was concluded, the Glock handgun purchased by ATF Agents was traced by the ATF National Tracing Center (NTC). The NTC contacted HURDLE to inquire about who had purchased the Glock firearm and HURDLE responded with the UC SA's identification. After this occurred, HURDLE called UC SA 5427 and told him that ATF had just called to trace the firearm he purchased. HURDLE wanted to know what UC SA 5427 had done with the firearm. UC SA 5427 advised HURDLE that if he utilizes UC SA 6287 to purchase guns for him, UC SA 5427 will sometimes have UC SA 6287 report the gun stolen soon after to avoid UC SA 6287 from getting in trouble.

29.     HURDLE told UC SA 5427 that he was only looking out for him and didn't want him (UC SA 5427) to get in trouble for "holding a bag" or having a stolen gun.

30.     On or about April 30, 2024, I was contacted by ATF SA Tim Fudella of the ATF Buffalo NY Field Office. SA Fudella advised they were conducting a firearm trafficking investigation where their target, Dwayne Gordon, was purchasing firearms in North Carolina and transporting them to NY. ATF agents in NY were monitoring Gordon via electronic surveillance

and confirmed he was in the Winston-Salem, NC area on or about April 30, 2024. I physically observed Gordon at an address on Carver School Rd in Winston-Salem on April 30, 2024.

31.     On or about May 1, 2024, SA Fudella contacted me and advised they had interdicted Gordon in NY as he was traveling back from NC. NY ATF agents recovered four (4) handguns hidden inside the vehicle. These handguns appeared to be brand new. A trace request was completed on these firearms, and it was determined they were all purchased from HURDLE at EMPIRE ARMS on April 30, 2024. The firearms were purchased under the name Linda Cunningham, the mother of Gordon. NY ATF agents conducted a recorded interview with Gordon where he admitted to purchasing the firearms from HURDLE at EMPIRE ARMS.

32.     Gordon confirmed HURDLE conducts business from his residence and that anyone can walk into his business and buy a gun. Gordon stated he told HURDLE that he was a convicted felon and could not possess a firearm. Gordon stated HURDLE was not deterred and allowed Gordon to use his mother's identification to complete the ATF form 4473 for the sale of the firearms. Gordon stated he called the FFL and provided his mother's information via phone. Gordon stated his mother was never present when the transaction occurred and was unaware her information was being used to conduct the transaction. Gordon stated he meet HURDLE at his residence where HURDLE transferred him the four (4) handguns. Gordon stated the transaction occurred inside the garage of the residence where Gordon observed numerous other firearms on display. It should be noted that this description is consistent with undercover video previously obtained from inside the garage of HURDLE'S residence.

33.     On or about May 6, 2024, I utilized investigative tools to determine that on April 30, 2024, at 1703hrs HURDLE conducted a NICS check on Cunningham. I then used additional investigative tools to review video that depicted HURDLE'S green, lifted GMC pickup truck

bearing NC registration # TDN6155 arriving at his residence on April 30, 2024, minutes prior to the NICS check being conducted. HURDLE was the only occupant observed exiting the vehicle. There was no evidence to show that Cunningham was present at HURDLE'S residence when the NICS check was completed.

34.     On May 15, 2024, I conducted an interview with Linda Cunningham (mother of Dwyane Gordon). Cunningham confirmed that she has never purchased a firearm and did not give anyone permission to purchase a firearm using her information. Cunningham stated Gordon had called her from jail in New York and told her that he used her personal information to complete the firearms purchase.

35.     On June 18, 2024, ATF CI 22230 conducted a recorded phone call to HURDLE at (336)324-7792, where the CI inquired about purchasing firearms from HURDLE. The CI explained to HURDLE that the CI would be traveling from New Jersey to conduct the purchase and HURDLE explained that the CI would need someone with a North Carolina identification to complete the ATF form 4473 for the background check. The CI advised HURDLE that the CI would be bringing the CI'S girlfriend to complete the form 4473. The CI referenced Dwayne Gordon (listed above), referring to Gordon as "D" during the phone call and the CI explained he was a friend of "D's".

36.     On June 20, 2024, ATF Agents conducted an undercover controlled purchase of firearms from HURDLE at his residence, 4072 Southview Dr. in Greensboro, NC. This transaction was covertly audio and video recorded. ATF CI 22230 (an actual convicted felon) and ATF UC SA 5598 meet with HURDLE at his residence. The CI picked out four (4) firearms from HURDLE's inventory that he wished to purchase. UC SA 5598 was directed by HURDLE to complete the form 4473, marking "yes" that the UC SA was the actual purchaser of the firearms.

The UC SA told HURDLE that the UC SA was not the actual purchaser, that the CI was the actual purchaser and HURDLE confirmed for the UC SA to mark "yes".

37.      The UC SA then read from the form 4473 where the form asks if the purchaser was convicted of a felony or misdemeanor crime. The UC SA told HURDLE that the UC SA has never been convicted of a misdemeanor or felony but that the CI has been. During the transaction the UC SA openly stated that the CI was purchasing one of the firearms for another person named "Rasheed" (fictious person). HURDLE asked the UC SA and the CI where "Rasheed" lived, and the UC SA replied to HURDLE by saying "New Jersey".

38.      Additionally, during the transaction, the UC SA asked HURDLE what happens if one of the firearms is found by law enforcement and HURDLE told the UC SA that law enforcement would contact the UC SA to inquiry about the firearm. The UC SA replied by saying that she was aware of this because this has happened before, and that the CI was "gone" for six (6) or seven (7) years due to this. The UC SA was referring to the CI being in prison for this time frame.

39.      Additionally, while the CI was deciding on what firearm to purchase, the CI stated to HURDLE that he needed something he could tuck in his waistband because he was not able to openly carry the firearm like the UC SA was able to do. The UC SA responded by telling the CI if the CI would stay out of jail this wouldn't be an issue. All the above conversation was either directly with HURDLE or made in the presence of HURDLE.

## CONCLUSION

40.      Based on these facts, I submit there is probable cause to believe that violations of 18 U.S.C. § 933 [Trafficking in Firearms] have been committed by Anthony HURDLE. Furthermore, I submit there is probable cause to believe that evidence related to the above

violations are currently stored on Anthony Burnett HURDLE'S electronic communication/storage devices currently located within the residence of 4072 Southview Dr. in Greensboro, NC 27407. Additionally, Anthony Burnett HURDLE is required to keep his business records for EMPIRE ARMS which includes ATF form 4473 on the premises of his business/residence. These records are necessary to confirm firearms transactions and/transfers. Any attempt to obtain these records without legal process would compromise My investigation into EMPIRE ARMS.

41. Additionally, HURDLE'S primary vehicle which he is the registered owner of is a GMC Seirra 1500 pickup truck bearing NC registration# TDN6155. I have observed this vehicle with signs displayed on the side doors advertising HURDLE as EMPIRE ARMS firearms dealer. This vehicle is also displayed on HURDLE's EMPIRE ARMS business Facebook page with the attached signs. Several independent sources from this investigation have described this vehicle as the one which HURDLE primarily operates to conduct his firearm transactions.

42. Based on these facts, I submit there is probable cause to believe that violations of 18 U.S.C. § 933 [Trafficking in Firearms] have been committed by Anthony HURDLE. Furthermore, I submit there is probable cause to believe that evidence related to the above violations are currently being stored within this vehicle.

43. Furthermore, information obtained throughout this investigation suggests that HURDLE's primary form of communication is his cellular device on which he has communicated with the ATF UC SA. These communications have been in the form of text messages, phone calls and social media messages. An extraction of the phone recovered by HSI confirmed text and phone communication occurred between their target and HURDLE's phone. These communications were

related to straw purchases, firearms trafficking, and the alleged possession of two machineguns by HURDLE.

44.    Based on these facts I submit there is probable cause to believe that violations of 18 U.S.C. § 933 [Trafficking in Firearms] have been committed by Anthony HURDLE. Furthermore, I submit there is probable cause to believe that evidence related to the above violations are currently stored on HURDLE'S electronic communication devices.

45.    Based on the aforementioned information, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 933 [Trafficking in Firearms] have been committed by Anthony HURDLE. I also submit that there is probable cause to search the Target Location described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

46.    I submit that if phones, computers, or storage medium are found at the Target Location or in the possession of Anthony Burnett HURDLE, this Affidavit supports probable cause for authorizing the search of the devices and seizure of records which they may contain.

47.    Based on my knowledge, training, and experience, I know that phone and computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a phone or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

48.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space- that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a phones or computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

49.     Wholly apart from user-generated files, phone, and computer storage media—in particular, phones and computers' internal hard drives—contain electronic evidence of how a phone or a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Phone and computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

50.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51.     Based upon my training and experience, I know that phone and computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to cloud-based storage. I also know that during the search of the premises it is not always possible to search phone and computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching phone and computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of phone and computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of phone or computer, software application, or operating system that is being searched;

b. Searching phone and computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Phone and computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since phone and computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c. The volume of data stored on many phone and computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Phone and computer users can attempt to conceal data within phone and computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the

extension to ".txt" to conceal the image and make it appear that the file contains text. Phone and computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, phone and computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a phone or computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

52.     Based on my own experience and consultation with other agents who have been involved in phone and computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a phone's or computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

    e.  The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed

above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

f.  In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

## PROCEDURES FOR UNLOCKING ENCRYPTED DEVICES

53.    The search warrant requests authorization to use the biometric unlock features of a device (including phones and computers), based on the following, which I know from my training, experience, and review of publicly available materials:

g.  Users may enable a biometric unlock function on some digital devices (including phones and computers). To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user

holds the device in front of the user's face with the user's eyes open for approximately one second.

h. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

i. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Anthony Burnett HURDLE'S thumb and/or fingers on the device(s); and (2) hold the device(s) in front of HURDLE' face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

54. Therefore, I request that the Court issue search warrants for the same.

55. Assistant United States Attorney Nicole R. DuPré has reviewed this affidavit.

56. Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

/S/ Jacob Hudson
Special Agent, ATF
Bureau of Alcohol, Tobacco,
Firearms ad Explosives.

Sworn and subscribed before me telephonically this <u>1st</u> day of August 2024.  3:00 pm

_____
Hon. Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

## ATTACHMENT A

### Property to Be Searched

#### 4072 Southview Dr., Greensboro, North Carolina 27407

The Target Location is a residential address located at 4072 Southview Dr., Greensboro, NC 27407, within the Middle District of North Carolina. The residence is a single-story brick structure with white trim around the windows and a black shingled roof. The residence has a front porch with a white fence railing and stairs leading up to the front porch. The numbers "4072" are displayed in black on the front of the residence, directly above the stairs leading to the porch. This includes any cell phones seized from the defendant. This includes a 2017 GMC Sierra 1500 bearing NC registration plate TDN-6155 owned and operated by HURDLE if located during the execution of the warrant. Additionally, this includes any enclosed trailers or conveyances on the property. The following is a photograph of the premises to be searched:



## **ATTACHMENT B**

### **Particular Things to be Seized**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely, violations of 18 U.S.C. § 933 [Trafficking in Firearms] in the form of the following:

a.  Any firearm that does not have a lawful manufacturer stamp and/or serial number.

b.  Any unregistered firearm (where registration is required by Title 26 of the United States Code), to include short barrel rifles, silencers, Any Other Weapons, machinegun conversion devices, and machineguns.

c.  Any serialized firearms, including revolvers, pistols, rifles, shotguns, machineguns, silencers, and/or destructive devices, and/or ammunition as defined by Title 18, United States Code, Section 921(a)(3) and 921(a)(17) that can be marketed for sale or viewed as dealer inventory.

d.  Any "unfinished", "80%", or "blank" frames or receivers of any kind and in any state of completion.

e.  Any tools and/or equipment associated with the manufacture of firearms and machinegun conversion devices, such as to 3-D printers, polymers, filament, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, and/or other tutorial material regarding the manufacture of firearms.

f.  Any computer numerical control ("CNC") machines and/or computers/parts/tools associated with the use and/or association of the manufacturing and/or modifying of

firearms, firearm parts, frames/receivers (and firearm blanks of any kind) machineguns and/or machinegun parts such as templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

g. Any items pertaining to the ownership or control of firearms, firearm parts, or firearm ammunition, such as; firearm transactions records relating to the receipt, purchase, transfer, possession, sale, or transportation of firearms; photographs and/or videos of firearms, firearm parts, and firearm ammunition; documents which relate or refer to firearms; bills of sale which relate to firearms; and receipts and/or invoices which relate to firearms.

h. Personal books, papers, and receipts reflecting names, addresses, telephone numbers, and other contact or identification data relating to the acquisition and/or distribution of firearms.

i. Acquisition and Distribution (A&D) records related to the business of EMPIRE ARMS FFL.

j. Any and all firearms believed to be associated with the dealer inventory of EMPIRE ARMS FFL, to include personally owned firearms. The seizure of these firearms will be necessary to determine proper record keeping requirements as it relates to the FFL.

k. Personal tax statements, paycheck stubs, bank records, or other financial documents relating to personal income and the acquisition and/or purchasing of firearms, firearm components, firearm accessories, and firearm ammunition.

l. Receipts, invoices, notes, ledgers, bill-of-sales, and/or any record keeping documents relating to the acquisition and distribution of firearms or firearms parts, and/or tools or equipment associated with the manufacture of firearms.

m. Evidence and record keeping documents relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing.

n. Shipping records, shipping containers and/or boxes, and invoices relating to the purchase or shipment of firearms.

o. Customer and supplier information, including items identifying firearm customers and suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, invoices, mail, papers with telephone numbers and/or names and/or addresses, and similar items.

p. United States currency greater than $2,000, including any and all financial records to facilitate the investigation of the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the illegal sales, trafficking, or manufacturing of firearms.

q. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

r. Indicia of occupancy, residency, and/or ownership of the premises, including, but not limited to: financial income statements, documents, utility bills, telephone bills, property receipts, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, statements, identification documents, keys, and bank account records.

s. Any safes, vaults, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles on or within the premises. (Law enforcement shall be permitted to open such locked containers by force or by a locksmith if necessary).

t. The contents of any surveillance camera or surveillance system on the premises that may have captured/recorded previous firearm transactions.

u. Any computer equipment or digital devices that are capable of being used to commit or further the crimes described in the attached affidavit, or to create, access or store evidence, contraband, fruits or instrumentalities of such crimes, including: central processing units, laptop or notebook computers, tablets, and wireless communication devices, including mobile telephones, cellphones, and smartphones. (Law enforcement shall be permitted to search these devices)